W. M. GIBSON, President Board of Health, *vs.* THE STEAMER MADRAS.

APPEAL FROM DECISION OF JUDD, C. J., IN ADMIRALTY.

JANUARY TERM, 1884.

JUDD, C. J.; McCULLY and AUSTIN, JJ.

The meaning of the word "Quarantine" considered.

A steamer with smallpox on board held, under the circumstances, not to have been in quarantine during the time she lay outside the harbor, pending a controversy with the Board of Health, and under a prohibition by it to enter the harbor; and therefore not liable for expenses of the Board of Health in guarding her.

The decision of the Chief Justice, appealed from, was as follows:

OPINION OF THE CHIEF JUSTICE.

This is a libel in admiralty by the President of the Board of Health of the Hawaiian Kingdom against the steamer Madras, whereof W. H. Bradley is master, filed on the 12th of June. Attachment was made on the same day. On the filing of a bond, deemed sufficient by the libellant, the vessel was released from attachment.

The libel recites, in substance, that the steamship Madras arrived at the port of Honolulu on the 8th of April, 1883, upon a voyage from Hongkong, in China, with 745 Chinese passengers, of whom 600, more or less, were bound for the port of Honolulu; that the master signed a health certificate that there was no sickness on board; that libellant thereafter discovered that the said steamer was infected with a disease known as the "smallpox," and that two of the passengers were at that time sick with the said disease, of which fact the master was aware; that libellant caused the steamer to be kept out of the harbor of Honolulu, and the master and crew were wholly unable and insufficient to control their passengers; that several of the passengers escaped and attempted to land with a boat, and subsequently eight attempted

to swim ashore; that, in consequence of the neglect or inability of the master to control said passengers, the libellant caused a guard of eight to sixteen men to patrol about the steamer, and prevent unauthorized communication with the shore and the landing of her passengers or crew; that said guard was proper and necessary, and that, without the same, the smallpox would have been introduced among the inhabitants of this kingdom from the steamer, and great loss of life and damage would have ensued therefrom; that, by reason of the premises aforesaid, the Board of Health has been damnified in the sum of $1,742.25, according to the specification annexed, which shows these sums to have been expended in the hiring of guards and boats, etc.

The answer of Captain W H. Bradley, intervening, admits that the Madras arrived off the port of Honolulu on the 10th, and not on the 8th of April, upon a voyage from Hongkong, China, with the number of passengers mentioned in the libel; that he did sign and deliver to the pilot a qualified health certificate, which is now in custody of libellant, and which he craves leave to refer to; that libellant did discover that the Madras was infected with a contagious disease, known as smallpox; but that libellant discovered these facts in consequence of respondent having communicated them to the Port Physician of Honolulu. The respondent denies that the libellant caused the steamer to be kept out of the harbor of Honolulu, and afterwards respondent anchored her off the port, but avers that respondent brought his vessel to anchor off the port before any communication was had with libellant, or any officer of the Board of Health; that respondent's crew consisted of forty-two persons, and were able and sufficient to control said passengers. Respondent admits that some of the passengers endeavored to escape from the vessel, but that they were pursued and brought on board by some of the crew thereof. He admits that, subsequently, eight passengers did attempt to swim on shore. Respondent denies all the other allegations, and says that if the alleged expenses have been incurred, they have been incurred without any authority or justification in law against the respondent or the said vessel.

A short history of this case, as derived from the letters between the parties and oral testimony, is as follows: On the 10th

of April the Madras arrived off the port with smallpox among her Chinese passengers. She was boarded by the pilot, and Captain Bradley signed a health certificate wherein, after the printed words " no person has died or been sick of a contagious disease on board my vessel during the last six months," was written, "I have handed pilot a letter of explanation to the health officer of the port." The captain gave the pilot a letter to the port physician and one to the Minister of Foreign Affairs, the vessel having been anchored outside the harbor at the captain's request. The pilot delivered the letter to the port physician in the channel, as he was proceeding outside to the steamer. In both of these letters Captain Bradley says he has smallpox on board, and asks to be allowed to remove the Honolulu passengers to the quarantine station, and put his vessel into quarantine, and to have 200 tons of coal put on the dock before the Madras should come alongside, and then to have it taken on board by her crew, and the freight discharged in the same manner.

The same day, April 10th, the Secretary of the Board of Health sent to Captain Bradley a note acknowledging receipt of his note, stating that the Board of Health had met that day and had passed a resolution, of which a copy was inclosed, and also that the Government was ready to afford him every facility for assisting his vessel with coal, water and provisions, and other needed recruits, but that, in view of his having a contagious disease on board, they cannot permit him to land any passengers. The resolution of the Board of Health in substance " empowered its President to take such steps as he may deem proper, and every necessary precaution to avoid the risk of contagion, and in consequence to prevent the landing of any passengers from the steamer Madras."

On the 11th of April Captain Bradley sends a letter to the Board of Health, expressing his surprise that the Board of Health should have stated to the British Commissioner that they felt dissatisfied with his having furnished a false certificate of health, denying that he had done so, and that he had his ship anchored outside, and had sent for the port physician and furnished him with a faithful account of the condition of his ship. He apologizes for some language used in a letter written by him on the evening of the 10th, as being under excitement, and asks the

Board of Health to reconsider their resolution and allow him to land the Honolulu passengers, and offering to give a bond to pay their expenses while in quarantine. The President of the Board of Health replies on the 12th April, to the effect that the Board of Health see no reason to modify their resolution of the 10th instant, and decline to allow him to land any passengers, who are unquestionably liable to introduce a contagious disease into the country, offering to supply him with recruits, etc. The same day the President of the Board of Health informed Mr. Davies, the British Vice-Consul and agent of the vessel, that the Madras would not be allowed to land her passengers at all.

On April 14th, T. H. Davies & Co., agents of the Madras, applied to bring the ship under some quarantine regulations, such as the law might provide, etc.

To this the President of the Board of Health replied, under date of April 19th, that "the steamer Madras may be regarded as in quarantine, inasmuch as her commander has hoisted the yellow flag, by order of the Port Physician, and the vessel remains at anchor in the roadstead of Honolulu, which is made quarantine ground by statute, and has been supplied with necessary recruits, under quarantine surveillance," etc.

Mr. Davies replies, on same date, noting the declaration that the Madras may be considered in quarantine, and asking "that the Captain be informed what quarantine or other restrictions have to be observed by him from the breaking out of the latest case on board, in order to enable him to land his passengers at this port."

April 24th, the Secretary of the Board of Health replied that "the vessel was in quarantine for recruits, but not for passengers."

On the 5th of May an inspection of the Madras was made by three physicians of Honolulu. They reported no case of small-pox since April 21st, and recommended that the vessel be allowed to come inside the harbor, the ship, Captain and crew to remain in strict quarantine. The Honolulu passengers to be landed on the reef in quarantine, but the convalescents not to be landed. The ship to land cargo and receive coal and recruits in quarantine.

On the 7th of May the' Board of Health wrote to the agents of the Madras that the steamship Madras would be allowed to enter port and land her Chinese passengers in quarantine, under the following conditions : The vessel to pay all charges incurred for quarantine surveillance since she came to anchor in the roadstead and during her stay in port : The Chinese passengers will be landed on the reef of Kahakaaulana, and there placed in quarantine for at least ten days, and the vessel to pay all expenses of debarkation, food, guard and medical attendance for said passengers during the term of quarantine, and other definite regulations as to freight, baggage, coal and recruits, and that the agents of the steamer enter into a bond, to the amount of $20 for each passenger, to indemnify the Government for expenses in case any disease should break out during the quarantine.

May 8th—The Madras, on the Captain receiving this letter, steamed into port, but went back again to her anchorage on being informed by her agents that the Board of Health understood that the conditions imposed must be complied with before she entered the harbor. As the Madras was starting out of the harbor, eight Chinese passengers jumped overboard ; these men were picked up by the police boats and returned on board the vessel.

May 8th—Written notice was sent by the President of the Board of Health to Captain Bradley that the "steamer Madras, also yourself, officers, crew, passengers and freight of said vessel, being in quarantine and under the orders of the Board of Health," his attention is called to Sections 292, 293 and 295 of the Civil Code, which are recited in full.

May 9th—Mr. Davies reported verbally to the agent of the Board of Health that Captain Bradley informed him that a number of cases of smallpox were discovered on the Madras, concealed among other passengers. This report was made in writing to the President of the Board of Health by Mr. Davies on the 10th May. The same day the President of the Board of Health acknowledges receipt of this information, and informs Mr. Davies that the Board of Health will have to reconsider the action to be taken in reference to the vessel.

May 12th—Captain Bradley writes to the agent of the Board of

Health that during the night previous one of the steamer's boats was lowered by Chinamen, and got away from the ship, but as the Captain burnt lights to attract the attention of the guard-boats, the boat returned. The Captain then proposed a set of signals to be used in event of anything happening in the night, and asking the agent to watch for the signals.

Soon after this Mr. Davies was invited to a session of the Board of Health, where the affairs of the Madras were discussed. On the 12th May, Mr. Davies writes to the President of the Board of Health, saying that his firm was authorized, on behalf of Captain Bradley, to assent to all the conditions of the Board's letter to him of that date, and they (Davies & Co.) agreed to become sureties on the bond therein demanded, and to execute the same as soon as the document can be prepared.

Mr. Davies says, in his testimony, that he had recommended Captain Bradley to accede to all the conditions in regard to landing the passengers, and that the Captain did so. All expenses incurred in this matter, up to this date, were to be paid by the Madras, and a bond was to be given in the sum of $20,000 to cover expenses thereafter incurred, etc.

The bond was first to be signed, and a draft was submitted to Mr. Davies on the 14th May. It was deemed unsatisfactory by him and Captain Bradley, and, under advice of counsel, they declined to sign it, as containing provisions not agreed upon, to wit : that the obligors were to pay for (among other things) "the repairing or extending the buildings which may be used for accommodation of the said passengers." Negotiations then ceased.

On May 21st, Mr. Davies applied to the Board of Health to know if the Madras was in quarantine, and, if so, under what regulations ?

The President of the Board of Health declined to discuss the matter with Mr. Davies, considering that his firm were not the authorized agents of the Madras.

Then followed a reference of this matter by the agents of the Madras to the representative of the British Government, and through his intervention there was procured that the Madras should be entered at the Custom House, and that Messrs. Davies & Co. should be recognized as agents of the Madras, and that the

Madras was to be placed under the quarantine regulations of December, 1880.

On the 2d June it was agreed between Mr. Davies and the President of the Board of Health that a bond for $10,000 should be given to cover all future expenses, and that the previous expenditures of the Board of Health in this matter should be submitted to the Supreme Court, and on the 5th June the agents of the Madras agreed, in writing, in effect, that the question of the steamer's liability for the quarantine expenses in dispute should not be prejudiced by the landing of the passengers from the Madras. The bond was given, and the Madras was entered at the Custom House, and the Honolulu passengers landed in quarantine June 7th, and after some further misunderstandings, followed by explanations, as to making up the claim, preparing a case for submission to the Court, and in reference to the clearance of the vessel, which are not necessary to be here detailed, the matter was finally terminated by the filing of this libel.

There were many other matters put in evidence, as the impudent and hasty remarks made by the Captain of the Madras, as to what he would and would not do under certain circumstances, and the replies made to him, which are irrelevant to the issue before me, which is: whether the steamship Madras is liable for the expenditure of the Board of Health, as claimed?

The amounts of the charges made for the hiring of guards and boats are shown to be reasonable, being the actual sums paid out by the Board of Health in this behalf. The question remains whether there were expenses incurred under "quarantine regulations." Section 298 of the Civil Code reads: "All expenses incurred on account of any person, vessel or goods under any quarantine regulations, shall be paid by such person, vessel or owner of such vessel or goods, respectively."

There can be no question as to the vital necessity of maintaining a strict surveillance over vessels arriving here with dangerous and contagious diseases on board. It is the duty of the State to protect the public health. For this reason ample power is given by law to the Board of Health, and the general authority is given them to make such "quarantine regulations as it shall judge necessary for the health and safety of the inhabitants." (Section

292 Civil Code.) "Any vessel refusing to submit to quarantine, and leaving the quarantine ground before the expiration of the quarantine, or which shall be the means of clandestinely introducing into the Kingdom any contagious or dangerous disease, shall be liable to seizure, confiscation and sale." Section 295 Civil Code.

But the Board of Health has a duty to perform, as far as foreign vessels are concerned. One of these is given by Section 272 : "The Board of Health may, from time to time, establish the quarantine to be performed by vessels arriving at any port of the Kingdom." Now, a quarantine is defined to be (1), properly the space of forty days; appropriately, the term of forty days during which a ship arriving in port, and suspected of being infected with a malignant or contagious disease, is obliged to forbear all intercourse with the city or place. This time was chosen, because it was supposed that any infectious disease would break out, if at all, within that period. (2.) Hence, the word means restraint of intercourse to which a ship may be subjected, on the presumption that she may be infected, either for forty days or for any other limited period. (Webster's Dictionary, title Quarantine.)

It is a general rule in every country that the proper officers may determine the period of restraint at their discretion, according to circumstances, and I think that Section 292 of the Civil Code, in authorizing the Board of Health to establish the quarantine to be performed by all vessels, etc., was meant to confer this very power, to wit: that the period of restraint and non-intercourse to which vessels arriving here are to be subjected, must be definitely settled and established by the Board of Health. The very idea of a quarantine implies that it is for a definite, limited time. And it would be quite competent for the Board of Health, on the expiration of one quarantine, if there should be a fresh outbreak of disease on a ship, to establish a further quarantine.

I do not go to the extent of saying that the definite term of quarantine for all ships cannot be varied to suit the exigencies of any particular case or disease. I think, as the power is given to establish, "from time to time," the quarantine to be performed by vessels, that a ship, under exceptional circumstances, may be

subjected to exceptional quarantine, without the formality of repealing the formerly established period, and establishing a new term.

But I understand that the Board of Health had, by a regulation, last published in December, 1880, established a quarantine of fifteen days for crews and passengers of vessels having smallpox on board. (See Regulations Board of Health.)

Was the Madras regularly in quarantine while the Board of Health incurred the expenditures, the subject of this controversy? And were these expenditures incurred under any quarantine regulations? Unless they were, plaintiff cannot recover. It would not be just to exact the severe penalty of confiscation and sale of a vessel for expenses of quarantine, unless notice of the liability is given to the vessel, and she is made aware of the restraint imposed, and its duration and consequences. For instance, if a vessel should arrive here from a port infested with cholera, and a quarantine of twelve months should be established for her, it is quite possible that the vessel might not be willing to submit to it, and, if the nature of her voyage admitted of it, she might return to the port whence she came without undergoing quarantine.

I do not understand that the Madras was put in quarantine by the written declaration made by the President of the Board of Health of April 19th, that the Madras may be regarded as in quarantine, "qualified by the statement of the Secretary to the agents to the vessel that she was in quarantine for recruits but not for passengers," for no period of restraint was stated. It is difficult to understand what was meant by "quarantine for recruits but not for passengers." If the words mean anything, they mean that no period of restraint, however long, would suffice after which the passengers could be landed from the Madras. A statement being made to a ship, "you are in quarantine," this condition of things might last for months or years, and the expense of watching the vessel consume her entire value. I avoid saying anything here as to the power of the Government to altogether refuse permission to citizens of a State, with whom we have no treaty securing this right, to land in this Kingdom. For although the first resolution of the Board of

Health was to the effect that its President was empowered to prevent the landing of any passengers from the steamer Madras, this position was not adhered to by the Government, and the passengers were finally allowed to be landed. If the Madras had been placed in a definite quarantine, and quarantine regulations required her to be watched with guards in patrol boats, or otherwise, during this period, these and whatever expenses were necessarily incurred in maintaining this quarantine would have to be paid by the vessel.

She was, however, kept in a state of uncertainty for a period of nearly two months, and all the while the expenses were being incurred. The action taken by the Board of Health in allowing her well passengers to be landed and put in a quarantine of 21 days, could have been taken immediately on the arrival of the vessel here, and this large expenditure saved.

It was certainly necessary to watch the vessel to prevent passengers, weary of the restraints of a long voyage and excited by their fears of the disease among them, from escaping ashore, and thus spreading the infection among our people, but if the passengers were ever to be allowed to be landed on these shores, they should have been landed in quarantine, reasonably soon after their arrival here, and some guards would have been necessary, but for only a few days, exclusive of the period of shore quarantine, which is not in question in this suit.

The danger to the health of the community from smallpox was not at all lessened by detaining the ship outside, with so large a number of passengers confined on board for so long a time; in fact, the contagion increased on board during that time.

Quarantine Rule. 2, published on December 11, 1880, reads: "On the arrival of any vessel at any port of this kingdom having had or still having any person sick of smallpox on board, the vessel shall be detained in quarantine; the sick shall be sent to the quarantine hospital, and the crew and passengers shall be submitted to quarantine for fifteen days."

Now, if this regulation had been put in force against the Madras on her arrival at this port, the probability is strong that she would have been released from quarantine and sailed hence within a month.

It would not be just to compel the Madras to pay for guards in watching her for any longer than was necessary, say, for a period of a few days, sufficient to enable the authorities to prepare the quarters for the reception of the passengers. There is no testimony before me indicating precisely how many days would be sufficient. But it seems to me that one week would be ample time, and for guards for this period only is the Madras liable.

I can draw no other conclusion from the whole testimony in this case than this: That the Board of Health, from the time of the arrival of the Madras, April 10th, to May 7th, had not only not put the Madras in definite quarantine, but did not intend to put her into a quarantine contemplating the landing of her passengers after the danger from infection was over, for, up to this latter date, there is no intimation given to the Madras as to when the period of her non-intercourse with the shore would cease, or be likely to cease.

It is perfectly clear that, if the Board of Health had adhered to its decision, and the passengers per Madras had never been allowed to land, and she had gone off to some other port, the Board of Health could not have recovered from her their expenses incurred in restraining her from having intercourse with the shore, and the expenses now sued for are quite analogous, for they were incurred before the Madras was put in quarantine, which was not until about June 1st.

Judgment will be entered for the libellant for the amount of expenses of guards and boats for one week, and this matter is referred to the Clerk of the Court to assess and report to the Court. Each party to pay his own costs.

OPINION OF THE FULL COURT, BY McCULLY, J.

We shall not in this opinion repeat the statement of the case or of the various transactions and extensive correspondence, which have been set forth very fully in the published opinion of the Chief Justice, referring to that for such matters as are necessary for the better understanding of the whole case.

The libel is to recover $1,742 25, for expenses of guarding the steamer Madras, to prevent the clandestine landing of Chinese passengers from the ship while lying at anchor outside the har-

bor, and having smallpox cases on board; and the issue between the parties is, whether the steamer was at that time "in quarantine," and therefore chargeable with expenses incurred in maintaining such quarantine.

Sec. 298, Civil Code, reads: "All expenses incurred on account of any person, vessel or goods under any quarantine regulations shall be paid by such person or vessel, or owner of such vessel or goods respectively."

The Madras anchored off the port April 10th. On the 7th of May the Board of Health wrote to her agents that she would be allowed to enter port and land the Honolulu Chinese passengers in quarantine, under certain conditions. After further negotiations and delay she entered and was quarantined. Previously to this date there had been an absolute prohibition to enter the port and to land passengers. Only permission had been given to receive recruits under restrictions of non-intercourse, leaving her then to proceed to some other part of the world. It is not in controversy that the steamer was placed at the last in due quarantine, and in a different status to that in which she was held at first, and during the time the expenses here claimed were incurred. The essential and characteristic difference between these two states is, that the first was a prohibition to land passengers and freight upon any terms and at all; the second was what is commonly known as a quarantine, to be performed under quarantine regulations, whereby the passengers were landed at a lawful quarantine station; the sick separated from the well, and the well detained under medical inspection for a prescribed time, when, if it appeared that they were free from contagion, they should be discharged; and the freight to be landed at a quarantine station, there to undergo disinfection.

The word "Quarantine" is defined in Tomlin's Law Dictionary: "The term of forty days during which persons coming from foreign ports infected with the plague are not permitted to come ashore." Burrill's Law Dictionary takes the definition from Brande: "A period of time originally consisting of forty days, but now of variable length," etc.

Our own statutes, while not defining the word, imply from the phrases "quarantine to be performed," "expiration of the quar-

antine," etc., a term to be entered upon and finished with the result of access to the country. Regulations which the Board of Health have made express this clearly, *e. g.*, Quarantine Rule 2, published December 11, 1880, reads: "On the arrival of any vessel at any port of this Kingdom having had or still having any person sick of the smallpox on board, the vessel shall be sent to the quarantine grounds, the sick to be sent to the quarantine hospital, and the crew and passengers shall be submitted to quarantine for fifteen days."

It is not doubted that the period of quarantine detention and observation may be for so long as is necessary to insure that the ship, crew, passengers and freight bring no contagion or infection into the Kingdom, and that when a time is set it may be extended when it appears that it is necessary for the purpose. But in all quarantine statutes known to us we find that there are provisions for release as well as detention.

The captain of the Madras had reported on arrival that he had 586 passengers for Honolulu and some cargo. Under date of April 10, 1883, the day of his arrival, the Secretary of the Board of Health sent the following letter to the captain:

"I herewith enclose you a resolution of the Board of Health, unanimously passed at a meeting of the Board held at 2 p. m. this day. I am requested by his Excellency the President of the Board of Health to acknowledge receipt of your letter dated 'On Board Madras' this day, and to say that the Government are ready to afford you every facility for assisting your vessel with coal, water and provisions, and other needed recruits, but, in view of your having contagious disease on board, cannot permit you to land any passengers."

At a later date the Secretary of the Board informed the captain that "he was in quarantine for recruits, but not for passengers." These words can mean only what is expressed in the letter, that the ship may take recruits and sail on. Calling this a quarantine of any kind does not make it one.

We have considered the arguments of counsel for the libellant, that the term quarantine must receive a large and liberal construction, not always limiting it to what the regulations may pre-

scribe for ordinary cases, and likewise that the Board of Health has power to deal with special cases by special regulations, giving parties concerned personal notice of them. This may be conceded for argument in this case, but if our definition of a quarantine is correct, that it is a term of surveillance under prescribed regulations, to be performed and finished with a result, then no liberality of construction will reach to what is claimed by the libellant. For, as appears by the letter above quoted, the steamer was prohibited from landing passengers purely and simply. Prohibition is not quarantine. The steamer was "performing" nothing during the time that she was guarded by boats. At the end of the month she had not commenced a quarantine, and continuing in the state she then was, she would never have accomplished her quarantine. If she had at once accepted the order of the Board of Health as a finality, she would have taken her coal and other recruits under such restrictions as would have been imposed, and thereupon steamed out to sea. The libellant's demand is for a reimbursement of quarantine expenses, and recovery depends upon their having been such. They are the cost of guarding the ship by boats while she lay at anchor outside the harbor, under the prohibition of the Board of Health to enter. The prohibition might have been enforced in a supposable case by the guns of a fortress. But, however the prohibition was secured, and for however long a time, this alone cannot be considered to constitute quarantine. This is not to say that quarantine might not be performed on board a ship, as at some ports in the world it is. But in the case of the Madras no quarantine regulations were prescribed to be performed while she lay outside, her captain and agents meantime asking that she be admitted to perform quarantine, and the Board of Health denying the request.

As no question was raised before us as to the amount allowed by the Chief Justice for the week of guard while the Quarantine Station was got in readiness, we hereby affirm the previous judgment entire.

*Attorney General Neumann* and *F. M. Hatch*, for libellant.

*E. Preston*, for claimants.

Honolulu, February 26, 1884.